# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VERLA JEAN REID,
      Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
      Defendant.

No. 3:18-cv-153 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Verla Jean Reid ("Reid") moves to reverse the decision by the Social Security Administration ("SSA") denying her claim for disability insurance benefits or, in the alternative, to remand the case for a new hearing. Mot. to Reverse, Doc. No. 23. The Commissioner of the Social Security Administration[1] (the "Commissioner") moves to affirm the decision. Mot. to Affirm, Doc. No. 27. For the reasons set forth below, I **grant** Reid's motion and **deny** the Commissioner's.

## I.      Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

---

[1] The case was originally captioned "Verla Jean Reid v. Nancy A. Berryhill, Acting Commissioner of Social Security." Since the filing of the case, Andrew Saul has been appointed the Commissioner of Social Security.

(citing 20 C.F.R. §§ 404.1520(c), 404.1521).  Third, if the claimant does have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations.  *Id.*  (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record."  *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)).  "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment."  *Id.*  Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work."  *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)).  Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy."  *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)).  The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria.  *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry.  *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418.  If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five.  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).  At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity."  *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

Reid applied for supplemental security income ("SSI") and social security disability insurance ("SSDI") benefits on October 27, 2014, alleging that she suffered from a disability since May 1, 2012. Ex. 3 to Ans., R. at 11. As set forth more fully below, Reid's application was denied at each level of review. She now seeks an order reversing the decision or in the alternative, remanding for a new hearing.

A.    Medical History[2]

---

[2] The following facts are statements drawn from Reid's Stipulation of Facts, to which the Commissioner stipulated. *See* Stipulation of Facts, Doc. No. 29-1. Other facts relied upon to which the Commissioner did not stipulate are corroborated in the record.

Reid's medical problems date back to her early childhood. As a young child, Reid was physically abused by her mother and stepfather. Exs. 3, 8 to Ans., R. at 56–59, 74, 308. The beatings were severe, and on one occasion resulted in stitches. Ex. 3 to Ans., R. at 56. Reid consequently lived with her grandparents, during which time her aunt's boyfriend attempted to rape her. Exs. 3, 8 to Ans., R. at 57–58, 305.

At age thirteen, Reid started to regularly use marijuana, alcohol, and nicotine. Ex. 8 to Ans., R. at 299. Reid was sexually active by age fifteen and pregnant with her first child by age sixteen. Ex. 8 to Ans., R. at 300. When Reid was eighteen, her infant son died from Sudden Infant Death Syndrome. *Id.* She turned to crack cocaine and continued to use crack "fairly consistently" for twenty-two years. *Id.* Reid ultimately had five children, whom various family member raised due to Reid's drug and alcohol problems. Exs. 3, 8 to Ans., R. at 75, 300.

On September 24, 2007, when Reid was forty-one years old, Reid sought psychiatric treatment at the Greater Bridgeport Community Mental Health Center, also referred to in the record as Southwest Connecticut Mental Health System ("Southwest"). Ex. 8 to Ans., R. at 311. She was seen by psychiatrist Judith Wolf, M.D., whom Reid continued to see through the date of the Administrative Law Judge ("ALJ") hearing on January 24, 2017. Exs. 8, 13 to Ans., R. at 291, 1256–61. According to Dr. Wolf's notes from the initial meeting, Reid suffered from decreased sleep, decreased appetite, an extremely labile mode, impaired recent memory, a rapid flow of thoughts, paranoid ideations, and on and off auditory hallucinations. Ex. 8 to Ans., R. at 291, 309. Dr. Wolf also observed that Reid was depressed, anxious, disorganized in her thinking, and easily angered. *Id.* At that point, Reid's substance abuse had been in remission for two years. Ex. 8 to Ans., R. at 307.

Dr. Wolf diagnosed Reid with psychosis, polysubstance abuse in remission two years, and with a current GAF[3] score of 45 and a high GAF score in the past year of 65. Ex. 8 to Ans., R. at 295, 310. In February 2008, the diagnosis was modified to Schizoaffective Disorder and Polysubstance Dependence, cocaine and alcohol, in remission for two years. Ex. 8 to Ans., R. at 329. Dr. Wolf prescribed Lithium and Invega to treat Reid's schizophrenia. *See* Stipulation of Facts, Doc. No. 29-1, at ¶ 13.

From 2011 through 2013, Reid was inconsistent with her treatment. Stipulation of Facts, Doc. No. 29-1, at ¶¶ 14, 15. On May 16, 2012, Reid relapsed on alcohol and cocaine, and was hospitalized at Yale New Haven Hospital for an attempted suicide by overdose on prescription medications. Ex. 9 to Ans., R. at 501.

Beginning in 2014 and through the relevant time period, Reid became relatively consistent with her treatment program, which consisted of weekly meetings with her therapist, weekly group therapy sessions, and meetings with an employment specialist. Ex. 8 to Ans., R. at 424–25; Stipulation of Facts, Doc. No. 29-1, at ¶ 16. In addition, Reid started to participate in Southwest's peer support program. Stipulation of Facts, Doc. No. 29-1, at ¶ 16. Through the program, Southwest offered participants "jobs" and paid them a small stipend. Ex. 3 to Ans., R. at 35, 53; Stipulation of Facts, Doc. No. 29-1, at ¶ 16. Reid's "job" was to serve as a greeter. Ex. 3 to Ans., R. at 35, 53; Stipulation of Facts, Doc. No. 29-1, at ¶ 16. As such, Reid was responsible for greeting other patients as they arrived for Southwest activities and for preparing coffee. Stipulation of Facts, Doc. No. 29-1, at ¶ 16.

As Reid's attendance improved, so did her functioning. Stipulation of Facts, Doc. No. 29-1, at ¶ 16. Although Reid continued to experience intermittent auditory hallucinations and

---

[3] "GAF" refers to the Global Assessment of Functioning, which rates overall psychological functioning on a scale of 0 to 100.

started to experience panic attacks throughout 2014, she reported that she was otherwise functioning adequately. Stipulation of Facts, Doc. No. 29-1, at ¶ 16; Ex. 8 to Ans., R. at 379. Throughout 2015, Reid continued to experience intermittent auditory hallucinations, and suffered from depression and short-term memory loss. Exs. 8, 11 to Ans., R. at 343, 385, 917; Stipulation of Facts, Doc. No. 29-1, at ¶¶ 17, 18. On July 1, 2015, however, Reid reported that she felt good and had stopped hearing voices for the time being. Ex. 11 to Ans., R. at 926. She continued to report longstanding short-term memory problems and residual paranoia related to her history of trauma. *Id*.

In 2016, Reid's treatment plan included group therapy facilitated by at least one and typically two MHC mental health providers, psycho-education groups, Consumer Council meetings, meetings with guest speakers, Tai Chi classes, group psychotherapy for Integrated Dual Disorders Treatment, groups to plan holiday events, meetings with employment specialists, weekly one-on-one meetings with a therapist, medication management sessions every one or two months, and collaboration meetings to participate in refilling her medication. Stipulation of Facts, Doc. No. 29-1, at ¶ 24; Exs. 12, 13 to Ans., R. at 1061, 1173, 1177, 1179.

The Three-Month Recovery Plan Review dated January 12, 2016, signed by Dr. Wolf, therapist Stephen Brown, and others, provided that Reid had demonstrated "[g]ood progress with recovery goals over the recent period." Ex. 13 to Ans., R. at 1161. Her auditory hallucinations were at "very low levels," and she had been "less volatile and in better control over her mood." *Id*. Although the assessment reported that Reid had "struggled to incorporate attendance at [Narcotics Anonymous] meetings into her routine," her attendance at treatment appointments was around 70% – an increase from a rate of approximately 50% in 2015. Exs. 12, 13 to Ans.,

R. at 1088, 1161. The review concluded that Reid "appears free of major mental health [symptoms] about 75% of her time." Ex. 13 to Ans., R. at 1161.

According to subsequent reviews in July and October 2016, Reid continued to make "good progress" with her recovery goals. Ex. 12 to Ans., R. at 1072 (July 2016 Review Plan); R. at 1144 (October 2016 Review Plan). Staff comments, however, indicated that "when not doing well, [Reid] experiences auditory hallucinations, paranoia, extreme irritability, and mood disturbance." Ex. 12, 13, R. at 1074, 1146. In October 2016, Dr. Wolf diagnosed Reid with Schizoaffective disorder and a current GAF score of 55. Ex. 13 to Ans., R. at 1150.

B. Medical Opinions

As discussed further below, the record includes the following medical opinions:

   a. Consultative Examination Report, dated March 4, 2015, from Melissa Artiaris, Pys. D. Dr. Antiaris evaluated Reid on March 4, 2015. Ex. 10 to Ans., R. at 865–69.
   b. Opinion, dated March 25, 2015, from DDS consultant Deborah Stack, Ph.D. Dr. Stack neither examined nor treated Reid. Ex. 4 to Ans., R. at 94–105.
   c. Mental Medical Source Statement, dated July 22, 2015, from Linda Wolf, M.D. Dr. Wolf treated Reid from 2007 through the date of the hearing, January 24, 2017. Ex. 11 to Ans., R. at 956–61.
   d. Mental Medical Source Statement, dated January 18, 2017, from Dr. Wolf. Ex. 13 to Ans., R. at 1256–61.
   e. Psychological Evaluation Report, dated January 23, 2017, from Derek Franklin, Psy. D. Dr. Franklin examined Reid on January 23, 2017. Ex. 3 to Ans., R. at 72–80.

   i. *Dr. Antiaris's Consultative Examination Report, dated March 4, 2015*

On March 4, 2015, Melissa Antiaris, Psy. D., performed a psychological evaluation of Reid for DDS as a consultative examiner. Ex. 10 to Ans., R. at 865–69. Dr. Antiaris diagnosed Reid with Schizoaffective disorder, and cocaine and alcohol use disorder in full remission. *Id*. The prognosis was "guarded," and Dr. Antiaris advised Reed to "continue with her current psychiatric and psychological treatment as provided." Ex. 10 to Ans., R. at 868.

As provided in her report, Dr. Antiaris observed that Reed was "cooperative," that her speech was "fluent and clear," and that her expressive and receptive language were "adequate." Ex. 10 to Ans., R. at 867. Dr. Antiaris noted that Reid was "[c]oherent and goal directed," and found "no evidence of hallucinations, delusions, or paranoia" that day. *Id.* Dr. Antiaris stated that Reid is "able to dress, bathe, and groom herself," and "can cook, clean, do laundry, and shop." Ex. 10 to Ans., R. at 868. Further, Reid "can manage her funds and take public transportation." *Id.* Reid reported that she gets along well with her children and her sister, although she does not see her sister often. *Id.*

Dr. Antiaris judged Reid's cognitive functioning to be in the "borderline range." Ex. 10 to Ans., R. at 867. Dr. Antiaris noted that her "[g]eneral fund of information" was "appropriate to experience," that her insight was "fair," and that her judgment was "poor." *Id.* She opined that Reid's attention and concentration were "[m]ildly impaired due to limited intellectual functioning," and that Reid's recent and remote memory skills were also "[i]mpaired due to limited intellectual functioning." *Id.* Dr. Antiaris further assessed Reid to be "moderately limited" in her ability to: (i) "maintain attention and concentration and a regular schedule;" (ii) "learn new tasks and perform complex tasks independently;" and (iii) "make appropriate decisions and relate adequately with others." Ex. 10 to Ans., R. at 868. Dr. Antiaris observed that Reid was "markedly limited" in her ability "to appropriately deal with stress," but that there were "no limitations" in Reid's "ability to follow and understand simple directions and instructions or perform simply tasks independently." *Id.* Dr. Antiaris determined that Reid "does require supervision." *Id.*

ii.    *Dr. Stack's Opinion, dated March 25, 2015*

On March 25, 2015, Dr. Stack rendered an opinion on Reid's work capacity. Ex. 4 to Ans., R. at 94–105. She did not examine Reid, and appears to have given equal weight to Dr. Antiaris's report and Dr. Wolf's records in formulating her opinion. *See* Ex. 4 to Ans., R. at 99 (noting "[w]eight distributed between psy examiner and TP"). Based on the following limitations, Dr. Stack concluded that Reid was restricted to unskilled work and determined that Reid was not disabled. Ex. 4 to Ans., R. at 104.

With respect to understanding and memory, Dr. Stack found "not significantly limited" Reid's ability to remember locations and work-like procedures, or her ability to understand or remember very short and simple instructions. Ex. 4 to Ans., R. at 101. Dr. Stack opined that Reid's ability to understand, remember, and carry out detailed instructions was "moderately limited," as was her ability to "maintain attention and concentration for extended periods." Ex. 4 to Ans., R. at 101. She also concluded that Reid had "sustained concentration and persistence limitations." *Id.*

With respect to concentration and persistence, Dr. Stack found Reid "not significantly limited" in her ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." Ex. 4 to Ans., R. at 102. Her ability to: i) sustain an ordinary routine without special supervision; ii) carry out very short and simple instructions; and iii) make simple work-related decisions was likewise found to be "not significantly limited." Ex. 4 to Ans., R. at 101, 102. In contrast, Reid was considered to be "moderately limited" in her ability to: i) carry out detailed instructions; ii) maintain attention and concentration for extended periods; and iii) work in coordination with or in proximity to others without being distracted by them. *Id.* Reid's ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods was similarly found to be "moderately limited." *Id*. at 102.

With respect to social interactions, Dr. Stack found that Reid's ability to interact appropriately with the general public, as well as her ability to accept instructions and respond appropriately to criticism from supervisors, was "moderately limited." *Id*. Reid's ability to ask simple questions, request assistance, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes was found to be "not significantly limited," as was her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id*.

With respect to adaptation capabilities, Dr. Stack concluded that her ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others was "moderately limited." Ex. 4 to Ans., R. at 103. Reid's ability to be aware of normal hazards and to take appropriate precautions, as well as her ability to travel in unfamiliar places or use public transportation, was found to be "not significantly limited." *Id*.

        iii.    *Dr. Wolf's Mental Medical Source Statement, dated July 22, 2015*

On July 22, 2015, Linda Wolf, M.D., completed a Mental Medical Source Statement on behalf of Reid. Ex. 11 to Ans., R. at 956–61. As outlined in her report, Dr. Wolf diagnosed Reid with Schizoaffective Disorder and Polysubstance Dependence in remission with a current GAF score of 50, and prescribed Risperdal and Lithium. Ex. 11 to Ans., R. at 956. Her prognosis of Reid was "fair." *Id*.

Dr. Wolf identified the following signs and symptoms in Reid: appetite disturbance with weight change, decreased energy, impairment in impulse control, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, paranoid thinking or

inappropriate suspiciousness, substance dependence, emotional withdrawal or isolation, intense and unstable interpersonal relationships, impulsive and damaging behavior, hallucinations or delusions, and emotional lability. Ex. 11 to Ans., R. at 957.

With respect to unskilled work, Dr. Wolf opined that Reid would be "unable to meet competitive standards"[4] in her ability to: (i) work in coordination or proximity to others without being unduly distracted; (ii) complete a normal workday and workweek without interruptions from psychologically-based symptoms; (iii) accept instructions and respond appropriately to criticism from supervisors; and (iv) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Ex. 11 to Ans., R. at 958. Dr. Wolf also observed that Reid would be "seriously limited"[5] in her ability to: (i) remember work-life procedures; (ii) understand, remember, and carry out very short and simple instructions; (iii) maintain attention for two-hour segments; (iv) maintain regular attendance and be punctual within customary, usually strict tolerances; (v) sustain an ordinary routine without special supervision; and (vi) respond appropriately to changes in a routine work setting. Dr. Wolf explained that Reid's memory, concentration, and attention are impaired by her symptoms. *Id.*

Dr. Wolf concluded that Reid was "limited but satisfactory"[6] in her ability to make simple work-related discussions, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with normal work stress. *Id.* Dr. Wolf also found that Reid was "unlimited or very good" in her ability to ask simple questions or request assistance and be aware of normal hazards and appropriate precautions. *Id.*

---

[4] "Unable to meet competitive standards" is defined therein as having "noticeable difficulty . . . from 21 to 40 percent of the work day or work week." Ex. 11 to Ans., R. at 958.
[5] "Seriously limited" is defined therein as having "noticeable difficulty . . . from 11 to 20 percent of the workday or work week." Ex. 11 to Ans., R. at 958.
[6] "Limited but satisfactory" is defined therein as having "noticeable difficulty . . . no more than 10 percent of the workday or work week." Ex. 11 to Ans., R. at 958.

With respect to semiskilled and skilled work, Dr. Wolf opined that Reid would be "unable to meet competitive standards" in her ability to understand, remember, and carry out detailed instructions. Ex. 11 to Ans., R. at 959. Dr. Wolf assessed Reid to be "seriously limited" in her ability to set realistic goals or make plans independently of others, and in her ability to deal with the stress of semiskilled and skilled work. *Id*. Dr. Wolf elaborated that her assessment was informed by Reid's impaired memory and attention. *Id*.

With respect to "particular types of jobs," Dr. Wolf posited that Reid would be "unable to meet competitive standards" in her ability to interact appropriately with the general public, and would be "seriously limited" in her ability to maintain socially appropriate behavior. *Id*. Dr. Wolf attributed those limitations to Reid's paranoia. *Id*. Dr. Wolf also opined that Reid would be "unlimited or very good" in her ability to adhere to basic standards of neatness and cleanliness, travel in unfamiliar place, and use public transportation. *Id*. Finally, Dr. Wolf noted it was "unknown" whether Reid had a low IQ or reduced intellectual functioning, explaining that there was "no testing to confirm." Ex. 11 to Ans., R. at 959.

      iv.   *Dr. Wolf's Mental Medical Source Statement, dated January 18, 2017*

Dr. Wolf completed a second Mental Medical Source Statement on behalf of Reid on January 18, 2017. Ex. 13 to Ans., R. at 1256–61. Dr. Wolf diagnosed a Shizoaffective Disorder with a current GAF of 55 and added Cogentin to the medication regime. Ex. 13 to Ans., R. at 1256. Dr. Wolf identified the following signs and symptoms in Reid: (i) impairment in impulse control; (ii) mood disturbance; (iii) difficulty thinking or concentrating; (iv) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; (v) paranoid thinking or inappropriate suspiciousness; (vi) emotional withdrawal or isolation; (vii) intense and unstable interpersonal relationships and impulsive and damaging behavior; (viii)

perceptual or thinking disturbances; (ix) hallucinations or delusions; and (x) memory impairment – short, immediate, or long term. Ex. 13 to Ans., R. at 1257. Dr. Wolf reported that Reid "experiences auditory hallucinations and paranoid ideation that can be expressed in emotionally charged outbursts." Ex. 13 to Ans., R. at 1256.

With respect to unskilled work, Dr. Wolf opined that Reid was unable to "meet competitive standards" in her ability to: (i) complete a normal weekday and workweek without interruptions from psychologically based symptoms; (ii) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and (iii) deal with normal work stress. Ex. 13 to Ans., R. at 1258. In addition, Dr. Wolf found that Reid was "seriously limited" in her ability to: (i) perform at a consistent pace without an unreasonable number and length of rest periods; (ii) accept instructions and respond appropriately to criticism from supervisors; and (iii) respond appropriately to changes in a routine work. *Id.* Dr. Wolf explained that Reid "experiences [symptoms] daily irrespective of activity," that her "cognitive processing may be slowed," and that Reid can "misperceive intentions of others due to paranoia." *Id.* Dr. Wolf also observed that Reid's "paranoia and suspiciousness can impact relationships," and that Reid "can struggle" with "inconsistent expectations." *Id.*

Further, Dr. Wolf concluded that Reid was "limited but satisfactory" in her ability to: (i) remember work-life procedures; (ii) understand and remember very short and simple instructions; (iii) carry out very short instructions; (iv) maintain attention for two-hour segment; (v) maintain regular attendance and be punctual within customary, usually strict tolerances; (vi) sustain an ordinary routine without special supervision; (vii) work in coordination with or proximity to others without being unduly distracted; and (viii) make simple work-related decisions. *Id.* Dr. Wolf opined that Reid was "unlimited or very good" in her ability to ask

simple questions or request assistance and to be aware of normal hazards and take appropriate precautions. *Id.*

With respect to semiskilled and skilled work, Dr. Wolf concluded that Reid was "unable to meet competitive standards" in her ability to (i) understand and remember detailed instructions and (ii) deal with stress of semiskilled and skilled work. Ex. 13 to Ans., R. at 1259. Dr. Wolf found that Reid was "seriously limited" in her ability to carry out detailed instructions, set realistic goals, or make plans independent of others. *Id.* Dr. Wolf noted that Reid "struggles" with "focus and attention due to apparent cognitive impairments," and that symptoms are reactive to increased stress. *Id.*

With respect to "particular types of jobs," Dr. Wolf opined that Reid is "seriously limited" in her ability to (i) interact appropriately with the general public; (ii) maintain socially acceptable behavior; and (iii) travel in an unfamiliar place. *Id.* Dr. Wolf explained that Reid had a "[history] of conflict with past workers due to paranoia," a "[history] of violent outbursts related to interpersonal stress," and that her "problem-solving ability may be impaired." *Id.* Dr. Wolf opined that Reid was "unlimited or very good" in her ability to adhere to basic standards of neatness and cleanliness, and in her ability to use public transportation. *Id.*

Dr. Wolf noted that Reid would find the following demands of work stressful: (i) exercising independent judgment; (ii) working with other people; (iii) dealing with the public (strangers); (iv) dealing with supervisors; and (v) being criticized by supervisors. Ex. 13 to Ans., R. at 1260. Dr. Wolf also increased her estimate of the amount of time Reid would be absent from work due to her impairments or treatment from two days a month to three days a month. *Id.* Finally, Dr. Wolf noted that it was "unknown" whether Reid had a low IQ or reduced intellectual functioning, although it was "suspected." Ex. 13 to Ans., R. at 1259.

*Psychological Evaluation by Derek A. Franklin, Psy. D., dated January 23, 2017 (the "Franklin Report")*

On January 23, 2017, one day before the ALJ hearing, Derek Franklin, Psy. D., administered a psychological evaluation on Reid. Holly Heaven, Vocational Rehabilitation Counselor with the Bridgeport Bureau of Rehabilitative Services ("BRS"), referred Reid for the evaluation to help determine if Reid met the criteria for a learning disorder or mental health problems because Reid had difficulties keeping up with the job search requirements required by the Department of Social Services. Ex. 3 to Ans., R. at 72.

Dr. Franklin administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"). The WAIS-IV provides a single measure of general intellectual functioning, which comprises a full-scale IQ and four index scores. Ex. 3 to Ans., R. at 75. Reid obtained a full-scale IQ of 45, which places her in the 0.1 percentile. Ex. 3 to Ans., R. at 76. Accordingly, Reid's functioning capabilities are equal to or less than 99.9% of the national standardized sample and are within the mentally deficient range. *Id.*

Each of Reid's four index scores reflected mental deficiencies. Ex. 3 to Ans., R. at 75–76. More specifically, her verbal comprehension score revealed "significant impairment in the areas of word recognition and usage, verbal extraction and fund of information," which indicated "poor word knowledge, abstract reasoning, and undeveloped understanding of general principles related to social situations." Ex. 3 to Ans., R. at 75. Reid's perceptual reasoning index score demonstrated "poor spatial processing and motor dexterity as well as categorical reasoning." *Id.* Reid's working memory index score revealed "significant impairment in computations as well as recall of rote-span information," which indicated "poor abilities in immediate auditory recall, sequencing and attention and concentration." Ex. 3 to Ans., R. at 76. Finally, Reid's processing speed index score reflected "impaired abilities in visual motor coordination and cognitive

flexibility." *Id*. Testing for a learning disorder also produced scores "significantly below grade level expectations in the areas of spelling, mathematics, reading, and sentence comprehension." *Id*.

On a personality assessment, Reid received "elevated scores" in the areas of mood disturbance, anxiety, psychosis, and interpersonal problems, which indicated that Reid suffers from "problems with thinking, concentration and decision making due to unusual perceptions or beliefs." Ex. 3 to Ans., R. at 77. Dr. Franklin determined that Reid "struggles with phobic behaviors that are interfering in some significant manner in her life," which leads her to "monitor her environment in an unrealistic and vigilant fashion to avoid contact with the feared object." *Id*. Dr. Franklin also noted evidence of auditory hallucinations, which "may result in impulsive behaviors," as well as evidence of a "serious and chronic mood disorder," "paranoia and delusions," and "affective instability." *Id*. The results indicated that Reid has "inadequate socialization skills," and is "likely to be withdrawn, aloof and unconventional in her interactions with others." *Id*. The report further anticipated that Reid is "likely to have problems interpreting the normal nuances of interpersonal behavior that provide[] meaning to personal relationships." *Id*.

Reid also completed the TAT, which yields "stories about socialization and emotional involvement." Ex. 3 to Ans., R. at 77. Reid's stories indicated that she is "emotionally dependent upon others" and therefore "may suspend judgment to maintain affection," which makes her "vulnerable to exploitation." *Id*. Reid's stories further suggested that she has been "exposed to some level of trauma that continues to cause her emotional distress." *Id*. Finally, Reid is "likely to express in a negative way what she perceives as unnecessary intrusion into her personal dealings and may take offense when her motives are being challenged." *Id*.

Dr. Franklin diagnosed Reid with Schizoaffective Disorder, mixed type, and Intellectual Developmental Disorder, Moderate. *Id*. Dr. Franklin noted that the "positive features" of her schizoaffective condition are being managed by medication, and that Reid is "unlikely to function independently without long-term medication and behavioral intervention." Ex. 3 to Ans., R. at 78.

Dr. Franklin also opined that Reid's problems with "attending and concentration can be better explained by her mood dis-regulation." *Id*. Moreover, Reid is "highly vulnerable to stress" and has "cognitive deficits and socialization limitations." *Id*. Finally, although Reid "wishes for friends and productive relations with others, Ms. Reid's poor insight, judgment and intellectual deficits negatively affect her ability to understand the needs of others." *Id*.

Dr. Franklin further reported that Reid has "[p]oor word knowledge, visual scanning and concrete thinking," as well as "problems with complex mental tasks." *Id*. Moreover, "her deficient performance score confirms the negative impact of a mood disturbance." *Id*. Dr. Franklin also articulated a need for "additional testing to assess adaptive functioning" in light of Reid's full-scale score of 45. *Id*. Finally, Dr. Franklin concluded that the test results confirm a "low level functioning" in sentence comprehension, reading, math, and spelling, as well as an intellectual developmental disorder. *Id*.

Based on Reid's low cognitive scores, Dr. Franklin recommended a referral to the Department of Developmental Disabilities for further testing to determine Reid's eligibility for services. Ex. 3 to Ans., R. at 79. Dr. Franklin also advised of a likely need for a legal conservator, who would act on Reid's behalf to ensure her needs are met. *Id*. Dr. Franklin further concluded that, given Reid's history and cognitive limitations, Cognitive Behavioral

Therapy-Trauma-Focused treatment would be more appropriate than insight treatment.[7]  *Id.*

According to Dr. Franklin, it is also "essential" for Reid to continue with psychiatric medications

in order to "help her better manage her mood and psychosis."  *Id.*  Finally, with respect to

employment, Dr. Franklin noted:

> [I]t is unlikely that Ms. Reid would benefit from further academic or educational
> involvement.  A better approach is an emphasis on capitalizing on her non-verbal
> strengths and motivation to work.  Vocational training focusing on these traits is likely to
> be better tolerated and learned.  Ms. Reid works best when tasks are routine and
> repetitive in a low pressure, highly supervised and supportive setting.  Ms. Reid does
> better with concrete objects to manipulate than when she has to visualize information.
> Therefore, it is important to make new information as practical as possible.  Her poor
> working memory skills for acquired verbal knowledge, like vocabulary, that has been
> learned, practiced, and stored in long-term memory is impaired.  However, her memory
> skills are stronger when information is presented in both a visual [and] auditory mode,
> and she does better with language-based information than with numerical data.

> *Id.*

C. Procedural History

Reid applied for SSI and SSDI benefits on October 27, 2014.  In her application, Reid

alleged that she had been disabled with bipolar disorder, depression, sleep issues, and suicidal

behavior since May 1, 2012.  Ex. 5 to Ans., R. at 151.  The SSA denied Reid's claim on March

27, 2015.  Ex. 5 to Ans., R. at 137–40.  Reid sought reconsideration, but the SSA adhered to its

decision.  Ex. 5 to Ans., R. at 151.  Reid thereafter requested a hearing, which was held on

January 24, 2017 before ALJ Eskunder Boyd ("the ALJ").  Exs. 3, 5 to Ans., R. at 29, 168.

During the hearing, Reid first testified that she had difficulty reading and that she could

not read or understand a newspaper, and later stated that she could not read.  Ex. 3 to Ans., R.

41–42, 49.  When asked by the ALJ why she is disabled, Reid responded, "I'm parano[id].  I'm

---

[7] Cognitive Behavioral Therapy-Trauma-Focused treatment is an "evidenced based treatment modality helpful in
addressing problems associated with early trauma, domestic violence and impaired intellectual abilities." Ex. 3 to
Ans., R. at 79.  Dr. Franklin stated that Reid is likely receiving that treatment at Southwest.  *Id.*

traumatized when I'm around people . . . I can't be around people.  I went through so much when I was coming up.  They hurted me and I'm terrified.  I just like to be left alone."  Ex. 3 to Ans., R. at 45–46.  She further testified that she has panic attacks "[a]ll the time."  Ex. 3 to Ans., R. at 52.  She also stated that she hears voices, and that sometimes those voices want her "to attack."  Ex. 3 to Ans., R. at. 60–61.  In addition, Reid testified that she has trouble thinking clearly and gets confused "all the time."  Ex. 3 to Ans., R. at 64.

With respect to her treatment, Reid described how, during group theory sessions, she "won't talk" and will "just sit quietly."  Ex. 3 to Ans., R. at 47.  Reid also discussed how her responsibilities as a greeter at Southwest caused her stress.  Ex. 3 to Ans., R. at 53.  If someone poured coffee before it finished brewing, Reid needed to remove herself from the group and sit in the office.  Ex. 3 to Ans., R. at 53.  During a typical greeting session, which lasted from 8:30 p.m. to 1:00 p.m., Reid removed herself approximately four times for a period of about fifteen minutes.  Ex. 3 to Ans., R. at 53–54.  Reid also needed to separate herself from the group when it got "crowded."  Ex. 3 to Ans., R. at 55.

The ALJ also heard testimony from Vocational Expert Edmond Calandra.  The ALJ asked Calandra to consider a hypothetical individual with the following characteristics: an individual of Reid's age, education, and vocational background who is i) limited to medium work; ii) may never climb ladders, ropes, or scaffolds; iii) may occasionally climb stairs and ramps; iv) may occasionally balance, stoop, crouch, kneel, or crawl; v) should avoid concentrated exposure to pulmonary irritants; vi) could perform simple, routine, repetitive tasks; vii) can sustain concentration, pace, and persistence for two-hour segments; and viii) can have brief and superficial interactions with coworkers, but no interaction with the public. Ex. 3 to Ans., R. at 66.  The ALJ asked whether such an individual could perform Reid's past work, to

which Calandra responded that that individual would be able to perform the job of an assembler. *Id.*

For the second hypothetical, the ALJ asked Calandra to assume the same individual as in the first hypothetical, but with the following additional limitations: the individual i) cannot perform work requiring reading or writing; ii) has to receive instructions orally or by demonstration; iii) cannot engage in work requiring independent judgment making; and iv) cannot be responsible for the safety of others. Ex. 3 to Ans., R. at 66–67. Calandra stated that such individual could still perform the job of an assembler. *Id.* at 67.

For the third hypothetical, the ALJ asked Calandra to assume the same individual as in the second hypothetical but with the additional limitation that such individual is unable to sustain concentration, pace, and persistence for two-hour segments (or alternatively that the individual would be off task for at least 15 percent of the workday). *Id.* Calandra testified that such limitations would eliminate all work. *Id.*

For the fourth hypothetical, Reid's counsel asked Calandra to consider the same individual as in the first hypothetical but to also assume that the individual is unable to work within 15 feet of another worker. Ex. 3 to Ans., R. at 68. Calandra responded that those limitations would preclude past work. *Id.* Reid's counsel then asked whether work would be precluded if the worker is expected to be absent from work three days a month, to which Calandra responded affirmatively. Reid's counsel further asked how it would impact an individual's ability to perform Reid's past work if the individual is at a 12 percent lesser capacity than similarly situated coworkers. Ex. 3 to Ans., R. at 68–69. Calandra responded that such limitations would eliminate all work. Ex. 3 to Ans., R. at 69. Finally, Reid's counsel asked Calandra to assume the same individual as in the first hypothetical, but to add the limitations that

the individual is markedly impaired in her ability to handle normal work stress and is unable to meet competitive standards in dealing with normal work stress. *Id*. Calandra found those limitations would preclude all work identified. *Id*.

At the hearing, Reid's counsel also notified the ALJ that IQ testing had been conducted the day before, and estimated that the results would be available in a couple of weeks. *See* Ex. 3 to Ans., R. at 38. The ALJ responded, if "you can get it to me in time with the showing of good cause . . . I'll evaluate it for that." Ex. 3 to Ans., R. at 39. Before Reid's counsel was able to obtain and submit a copy of the results (the Franklin Report), on or about February 28, 2017, the ALJ issued an unfavorable decision concluding that Reid had not been disabled since May 1, 2012 and denying benefits.[8] Ex. 3 to Ans., R. at 8–23.

At the first step of the five-prong inquiry, the ALJ found that Reid had not engaged in "substantial gainful activity" since May 1, 2012. Ex. 3 to Ans., R. at 14. At the second step, the ALJ found that Reid's schizoaffective disorder, chronic obstructive pulmonary disease, and polysubstance abuse in remission constituted "severe" impairments. *Id*. At the third step, the ALJ found that such impairments were not per se disabling because they were not severe enough to meet the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Ex. 3 to Ans., R. at 14–15. Specifically, the ALJ found that Reid's mental impairments did not satisfy the "paragraph B" criteria of Listing 12.03 (schizophrenia spectrum and other psychotic disorders), which requires that the mental impairments result in at least one extreme[9] or two

---

[8] Reid's counsel stated that he visited the BRS office numerous times to secure a copy of the Franklin Report, to no avail. The evaluation was given to Reid in June 2017 during her visit to the BRS office, and was then submitted to the Appeals Council in conjunction with Reid's request for review. Exs. 3, 6, 7 to Ans., R. at 72–81, 181–82, 283–90.

[9] An "extreme" limitation means the claimant is unable to function independently, appropriately or effectively, and on a sustained basis, in that area. Ex. 3 to Ans., R. at 15.

marked[10] limitations in a broad area of functioning: i) understanding, remembering, or applying information; ii) interacting with others; iii) concentrating, persisting, or maintaining pace; and iv) adapting or managing oneself. Ex. 3 to Ans., R. at 15. The ALJ instead concluded that Reid only had "moderate"[11] limitations in those areas. *Id*.

The ALJ further concluded that Reid's impairments did not satisfy the "paragraph C" criteria, which applies to individuals requiring a high degree of weekly supervision or partial hospital treatment. Ex. 3 to Ans., R. at 16. The ALJ explained that Reid attends group sessions "on her own," and that Dr. Wolf's treatment plan dated April 2015 and therapy notes "do not describe paragraph C functional difficulties." *Id*.

Before proceeding to the fourth step, the ALJ assessed Reid's residual functional capacity ("RFC") and found that Reid could perform medium work as defined in C.F.R. sections 404.1567(c) and 416.967(c), with the following exceptions: i) she can never climb ladders/ropes/scaffolds; ii) can occasionally climb stairs/ramps, balance, stoop, crouch, kneel and crawl; iii) must avoid concentrated exposure to pulmonary irritants; iv) can perform simple, routine repetitive tasks; v) can sustain concentration, persistence, and pace for two-hour segments; vi) can have brief and superficial interactions with coworkers but no interaction with the public; vii) should have no work requiring reading/writing; viii) has to receive instructions orally or by demonstration; and ix) should have no work which requires independent judgment (i.e., no duties/schedules for others, no responsibilities for the safety of others). Ex. 3 to Ans., R. at 16.

---

[10] A "marked" limitation means functioning independently, appropriately, effectively, and on a sustained basis in that area is seriously limited. Ex. 3 to Ans., R. at 15.
[11] A "moderate" limitation indicates that functioning independently, appropriately, effectively, and on a sustained basis in that area is fair, rather than marked. Ex. 3 to Ans., R. at 15.

At Step Four, the ALJ found that Reid had the RFC to perform her past work as an "assembler, light, unskilled, skill level two." Ex. 3 to Ans., R. at 21. Accordingly, the ALJ determined that Reid was not disabled from May 1, 2012 through February 28, 2017, the date of the decision. Ex. 3 to Ans., R. at 23.

Reid requested a review of the ALJ's decision by the SSA's Appeals Council on April 12, 2017. Ex. 5 to Ans., R. 181–82. Finding no reasonable probability that the Franklin Report would alter the outcome of the ALJ's decision, the Appeals Council declined to consider the report and denied the request for review. Ex. 3 to Ans., R. at 1–7. Reid then filed a complaint with this court on January 25, 2018, requesting that I reverse the Commissioner's decision or in the alternative, remand for further administrative proceedings. *See* Compl., Doc. No. 1.

## III. Discussion

On appeal, Reid contends that she is entitled to a reversal of the Commissioner's decision. *See* Mot. to Reverse, Doc. No. 23. Reid argues that i) the ALJ improperly failed to obtain and consider the Franklin Report; ii) the Appeals Council erred by declining to consider the Franklin Report upon submission; and iii) the ALJ's decision is not supported by substantial evidence. *Id*. at 18–28. In response, the Commissioner contends that i) the ALJ fully developed the record; ii) the Appeals Council did not need to consider the Franklin Report because there was no reasonable probability that the report would have changed the outcome of the ALJ's decision; and iii) the ALJ's decision is supported by substantial evidence. Mot. to Affirm, Doc. No. 27-1, at 4–16.

A. The Appeals Council Erred by Not Considering the Franklin Report.

The parties first dispute whether the ALJ was required to secure the Franklin Report before issuing a decision. Reid argues that the ALJ was obligated to do so because the ALJ has a

duty to develop the claimant's complete medical history. *See* Mot. to Reverse, Doc. 23-1, at 19–20. As support, Reid cites to *Garcia v. Commissioner of Social Security*, where the Ninth Circuit observed that in a case where "a claimant has an intellectual disability and in which IQ scores are relied upon for the purpose of assessing that disability, there is no question that a fully and fairly developed record will include a complete set of IQ scores that report verbal, non-verbal and full scale abilities." 768 F.3d 925, 930–31 (9th Cir. 2014) (internal quotation marks omitted). The Commissioner disputes this, noting that Reid did not submit the report to the ALJ in a timely manner, that Reid's counsel did not request assistance in procuring the report, and that the ALJ was not required to issue a subpoena to obtain the report. Mot. to Affirm, Doc. No. 27-1, at 4–6.

Regardless of whether the ALJ had a duty to obtain the Franklin Report, I conclude the Appeals Council was obligated to consider the report upon its submission because it was new, material, and related to the relevant time period. The Appeals Council is required to "consider new and material evidence if it relates to the relevant time period." *McIntire v. Astrue*, 809 F. Supp. 2d 13, 21 (D. Conn. 2010) (quoting *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996)). Should the Appeals Council fail to do so, "the proper course for the reviewing court is to remand the case in light of the new evidence." *Id*. (internal citations omitted).

Courts have found that evidence is new if it "has not been previously considered during the administrative process." *Id*. (internal citations omitted). Moreover, evidence is material if it is "(i) relevant to the time period for which benefits have been denied and (ii) probative, meaning it provides a reasonable probability that the new evidence would have influenced the Commissioner to decide the claimant's application differently." *Id*. (internal citations omitted).

The only issue raised on appeal with respect to this inquiry is whether the Franklin Report is material. The Commissioner argues that the Appeals Council "did not consider the

Franklin Report because it did not show a reasonable probability that it would change the outcome of the decision." Mot. to Affirm, Doc. 27-1, at 6. Specifically, the Commissioner contends that, although the Franklin Report may contain the only evidence of Reid's IQ, the record contains other evidence of Reid's cognitive functioning, such as Dr. Antiaris's examination and Dr. Wolf's opinions. *Id*. at 7. The Commissioner further argues that a "low IQ score does not preclude competitive work," and that the Franklin Report's assessment of the conditions under which Reid could work "are entirely consistent with the ALJ's RFC findings." *Id*. at 7–8. That is, "by limiting [Reid] to simple, routine repetitive tasks that did not require independent judgment, did not involve reading or writing, and were relayed orally or by demonstration, the ALJ accounted for the limitations discussed in the Franklin Report." *Id*. at 8.

In her Reply, Reid maintains that the "limitations contained in the ALJ's RFC bear no relation to the findings made by Dr. Franklin," and that a "reasonable probability exists that the Franklin Report will change the outcome of this case." Reply Mem., Doc. No. 28, at 4. I agree. The Appeals Council should have considered the Franklin Report because it is reasonably probable that the evaluation would have changed the ALJ's decision. First, the Franklin Report may have offered Reid an additional basis for disputing the unfavorable portions of Dr. Antiaris's and Dr. Stack's opinions upon which the ALJ relied. In *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925 (9th Cir. 2014), an applicant who was denied Social Security benefits on the ground that she was not intellectually disabled challenged the ALJ's failure to obtain a complete set of IQ scores.[12] The Ninth Circuit held that the ALJ had a duty to order further IQ testing, and

---

[12] Although *Garcia* is not controlling and distinguishable in part because the ALJ denied benefits based on his determination that the applicant did not have an intellectual disability under Listing 12.05, I nonetheless find that case instructive for the reasons stated below. *Id*. at 928–29.

reversed the lower court's decision affirming the ALJ's ruling because the error was not harmless. *Id*. at 926.

In determining that the ALJ's error was not harmless, the court emphasized that two experts considered Garcia's incomplete IQ test results in evaluating her ability to obtain employment, and that the ALJ relied on those experts' assessments in determining that Garcia was not disabled. *Id*. at 932–34. As the *Garcia* court observed, "there is a genuine probability that, had a complete set of valid IQ test scores been included in the record, the opinions of the reviewing experts might have been different, or Garcia might have had an additional factual basis for challenging their opinions." *Id*. at 933. Moreover, "[t]he fact that IQ test results may be considered by multiple reviewing experts, as well as by the ALJ, makes it particularly difficult to conclude that any error affecting the quality of those results is 'inconsequential to [an] ultimate nondisability determination,' let alone to conclude that such harmlessness is 'clear from the record.'" *Id.*

Here, the ALJ considered two opinions that reflected no IQ testing: Dr. Wolf's Mental Medical Source Statements dated July 22, 2015 and January 18, 2017. As noted in those evaluations, Dr. Wolf suspected that Reid had a low IQ or intellectual functioning but could not confirm because no testing had been conducted. Exs. 11, 13 to Ans., R. at 959, 1259. More significantly, the ALJ's decision relied on the opinion of Dr. Antiaris, which reflected not only no scores but also inaccurate estimates. Ex. 3 to Ans., R. at 21. Dr. Antiaris opined that Reid's cognitive functioning was in the "borderline range," with her "[g]eneral fund of information [being] appropriate to experience." Ex. 10 to Ans., R. at 867. The Franklin Report, however, clarifies that Reid's full-scale IQ of 45 places Reid in the mentally deficient range of tested cognitive functioning, which is lower than Dr. Antiaris estimated. Ex. 3 to Ans., R. at 76.

Moreover, Dr. Stack's opinion, which the ALJ accepted, explicitly notes Dr. Antiaris's intelligence estimate. Ex. 4 to Ans., R. at 99. For those reasons, I think Reid's test results may have armed Reid with another basis on which to challenge the expert opinions, and therefore find a reasonable probability that the Franklin Report may have changed the ALJ's decision.

Second, the Franklin Report may have enabled Reid to satisfy the criteria in Listing 12.05 (Intellectual Disorder).[13] Clearly, Reid's IQ of 45 is well under the listing's requirement of 70 or below. Moreover, Reid has proffered evidence indicating that her intellectual disability began before she was twenty-two years old. For example, Reid only attended school from fifth to ninth grade, and reported to Dr. Antiaris that she was in special education classes. Exs. 3, 10 to Ans., R. at 74, 865. Although Reid could not recall why she was in special education classes, she posited that "there was something wrong with my brain." *Id.* In addition, Reid was unable to complete serial 3s during Dr. Antiaris's examination and is unable to read or write. Exs. 3, 10 to Ans., R. at 49, 867. And as the Second Circuit observed, "it is reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a fairly constant IQ throughout (their) li(ves)." *Talvara v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012) (internal citations omitted).

Finally, the Franklin Report contains evidence indicating that Reid is "extremely limited" in at least one of the four defined areas of mental functioning or "markedly limited" in at least two. With respect to Reid's ability to interact with others, for instance, Dr. Franklin observed that Reid has "inadequate socialization skills." Ex. 3 to Ans., R. at 77. Reid's verbal comprehension scores revealed not only "significant impairments" in her ability to communicate

---

[13] Listing 12.05(b) can be satisfied by a showing of (1) a full scale IQ score of 70 or below; (2) an extreme limitation of one, or a marked limitation of two, in the ability to a) understand, remember, or apply information, b) interact with others, c) concentrate, persist, or maintain pace, and d) adapt or manage oneself; and (3) evidence that the disorder began before age 22. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 112.05.

verbally, but also an "undeveloped understanding of general principles related to social situations." Ex. 3 to Ans., R. at 75. Reid also received "elevated scores" in mood disturbance, anxiety, psychosis and interpersonal problems. Ex. 3 to Ans., R. at 77. Dr. Franklin found "emerging evidence" of auditory hallucinations, which may lead to "impulsive behaviors." *Id*. Further, Reid "struggles with phobic behaviors that are interfering in some significant manner in her life, leading her to monitor her environment in an unrealistic and vigilant fashion to avoid contact with the feared object." *Id*. Finally, there was evidence of a "serious and chronic mood disorder," "paranoia and delusions," and "affective stability." *Id*.

Dr. Franklin also found that Reid "may have problems anticipating the logical consequences of social interactions and generating alternative solutions to problem solving," which may result in her "misinterpreting social cues and resulting in frustration." Ex. 3 to Ans., R. at 77. Dr. Franklin opined that Reid is "likely to be withdrawn, aloof and unconventional with her interactions with others, and, therefore, has few significant, positive interpersonal relationships." *Id*. Moreover, she is likely to "have problems interpreting the normal nuances of interpersonal behavior that provide[] meaning to personal relationships." *Id*. Those observations raise at least a reasonable probability that Reid's limitations are more severe than what was listed in the ALJ's RFC determination.

With respect to her ability to understand, remember, or apply information, Reid received "mentally deficient scores across the board in perceptual spatial integration," which suggests "poor spatial processing and motor dexterity as well as categorical reasoning." Ex. 3 to Ans., R. at 75. Further, Reid's working memory index score, which evaluates "the ability to hold information in immediate memory while performing a mental operation," reflected mental deficiencies and "poor abilities in immediate recall, sequencing and attention and concentration."

Ex. 3 to Ans., R. at 76. Dr. Franklin also observed that Reid has "poor working memory skills for acquired verbal knowledge." Ex. 3 to Ans., R. at 79.

With respect to concentration, persistence, and maintaining pace, the Franklin Report provides that Reid suffers from "problems with thinking, concentration and decision making due to unusual perceptions or beliefs. Co-morbid problems include feelings of depersonalization. Her thoughts are indicative of paranoia and delusions." Ex. 3 to Ans., R. at 77. That observation may undercut the ALJ's RFC finding that Reid can sustain concentration, persistence, and pace for two-hour segments. Ex. 3 to Ans., R. at 16. Finally, with respect to the ability to adapt or manage oneself, the evaluation noted that Reid is "highly vulnerable to stress," and suffers from cognitive deficits and socialization limitations that "may result in her risk of being exploited." Ex. 3 to Ans., R. at 78. In light of those findings, I think it is reasonably probable that the Franklin Report could have enabled Reid to meet Listing 12.05(b) and thus could have changed the ALJ's decision. Accordingly, I conclude that the Appeals Council erred by not considering the Franklin Report and remand the ALJ's decision for consideration of the Franklin Report.

B. The ALJ's Decision Is Not Supported by Substantial Evidence.

Reid also contends that the ALJ's decision is not supported by substantial evidence because the ALJ improperly discredited treating psychiatrist Dr. Wolf's opinions and ignored other evidence supporting the existence of a disability.[14] See Mot. to Reverse, Doc. 23-1, at 25. The Commissioner responds that substantial evidence supports the ALJ's decision and

---

[14] Specifically, Reid alleges that the ALJ also ignored Dr. Antiaris's findings that Reid is markedly impaired in her ability to deal with normal work stress, that Reid is estimated to function intellectually at the borderline range, and that Reid does "require supervision." See Mot. to Reverse, Doc. 23-1, at 26–27. Reid further contends that the ALJ wrongly disregarded Reid's testimony about the stress she experiences as a peer greeter and about her lack of engagement with others during group sessions at Southwest. See id. at 24.

specifically that the ALJ "appropriately considered the medical opinions in the record." Mot. to Affirm, Doc. 27-1, at 9–17.

The SSA "recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). According to the rule, the ALJ should defer to "the views of the physician who has engaged in the primary treatment of the claimant," but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the claimant's] case record." *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (internal quotation marks and citations omitted).

Even when a treating physician's opinion is not given "controlling" weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive. *See Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(d)(2)). Those factors include: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129). After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Burgess*, 537 F.3d at 129 (internal citations omitted). "Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.* at 129–30 (internal citations omitted). The Second Circuit has also "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has observed that, generally, "a consulting physician's opinions or reports should be given little weight." *Johnson v.*

*Berryhill*, 2017 WL 2381272, at *9 (D. Conn. June 1, 2017) (internal citations and quotation marks omitted).

In the present case, the ALJ accorded "little weight" to the July 2015 and January 2017 opinions issued by treating psychiatrist Dr. Wolf. Ex. 3 to Ans., R. at 20. In assigning that weight, the ALJ noted that the "pessimistic tone" of Dr. Wolf's assessments "veers, considerably, from the content of the Southwest treatment notes." *Id*. The ALJ specified that Dr. Wolf's notes about "intense, unstable interpersonal relationships or emotional lability are in contrast to the Southwest clinic notes of [Reid's] extended recovery." *Id*. In addition, according to the ALJ, Dr. Wolf's "estimate about effects of paranoid ideas contrasts, directly, with clinic notes showing decreased paranoia and extended group participation." *Id*. Moreover, the ALJ concluded that Dr. Wolf's estimate of "serious limits in maintaining socially acceptable behavior, is not consistent with the improvement in the cited Southwest notes." *Id*. In contrast, the ALJ assigned "partial weight" to the "nonexaminers' estimates of how the claimants' combined mental disorders reduce her RFC." Ex. 3 to Ans., R. at 21.

I conclude that the ALJ failed to articulate "good reasons" for not crediting Dr. Wolf's opinions. *See Burgess*, 537 F.3d at 129. As an initial matter, the Commissioner's reason for rejecting Dr. Wolf's opinion – that the Southwest clinic notes conflict with Dr. Wolf's assessments – is belied by the record. Ex. 3 to Ans., R. at 20. Although the Southwest treatment notes do convey demonstrated improvement and more consistent participation in treatment, they are not universally positive. For instance, the more recent progress notes in the record, dated October 26, 2016, provide that, "[w]hen not doing well, [Reid] experiences auditory hallucinations, paranoia, extreme irritability and mood disturbances." Ex. 13 to Ans., R. at 1146. In addition, the treatment notes dated April 27, 2015 specify that Reid "tends to isolate herself

and to avoid others at times. This avoidance causes her to not see when she is headed for a crisis until she is already overwhelmed." Ex. 12 to Ans., R. at 1085.

Further, any optimistic comments concerning Reid's progress in treatment are not necessarily inconsistent with Dr. Wolf's more pessimistic opinions regarding Reid's work capabilities. The treatment notes reflect observations of Reid in a highly controlled, supportive, and supervised environment; her progress in such an environment does not necessarily inform how she would function in a competitive work setting. *See Arnett v. Shalala*, 46 F.3d 1138 at *4 (9th Cir. 1995) ("The ability to work only in highly structured environments, such as sheltered workshops, does not establish the capacity to engage in substantial gainful activity") (internal citations omitted); *see also* 20 C.F.R. § 404, Subpt. P, App. 1, Part B2 ("For example, you may spend your time among only familiar people or surroundings, in a simple and steady routine or an unchanging environment, or in a highly structured classroom or alternative school. However, this does not necessarily show whether you would function age-appropriately without those supports or contexts.").

In addition, Dr. Antiaris and Dr. Stack based their opinions on an incomplete medical record. Both experts made their determinations reviewing evidence in the record up to March 2015. The ALJ, however, rendered his decision in February 28, 2017, nearly two years later. Therefore, Dr. Antiaris and Dr. Stack did not consider Dr. Wolf's July 2015 and January 2017 opinions, nor did they consider later progress notes from Southwest, among other records. The ALJ's decision to accord more weight to their opinions is especially puzzling considering that Dr. Wolf's opinions were considerably more recent. Finally, Dr. Wolf spent a decade treating Reid; in contrast, Dr. Antiaris examined Reid once and Dr. Stack never performed an in-person consultation with Reid. Accordingly, I conclude that the ALJ did not provide sufficiently good

reasons for the weight accorded to Dr. Wolf's opinions.  I therefore remand for further

consideration of Dr. Wolf's opinions.  Should the ALJ still decline to give controlling weight to

Dr. Wolf's opinions, Reid is "entitled to a comprehensive statement as to what weight is given

and of good reasons for the ALJ's decision."  *Burgess*, 537 F.3d at 132.

**IV. Conclusion**

For the reasons set forth, I **deny** the Commissioner's motion to affirm and **grant** Reid's

motion to reverse to the extent that it asks that I vacate the decision of the Commissioner.  I

remand for consideration of the Franklin Report and for consideration of the weight to be

accorded to the various medical opinions provided to the ALJ, consistent with the foregoing

reasoning.  The Clerk is further instructed that, if any party subsequently appeals to this court the

decision made after remand, that Social Security appeal shall be assigned to me (as the District

Judge who issued the ruling that remanded the case).


So ordered.

Dated at Bridgeport, Connecticut, this 3rd day of October 2019.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
